IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS

JOHN DOE,

       Plaintiff,

v.                              Docket No. 2:19-cv-02336-JTF

RHODES COLLEGE.

       Defendant.

## SECOND AMENDED COMPLAINT FOR VIOLATION OF TITLE IX OF THE CIVIL RIGHTS ACT OF 1964, FOR BREACH OF CONTRACT, AND FOR NEGLIGENCE

TO THE HONORABLE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF TENNESSEE AT MEMPHIS:

COMES NOW John Doe (hereinafter "Plaintiff" or "Doe") and amends his "Verified Complaint for Violation of Title IX of the Civil Rights Act of 1964" and "First Amended Complaint for Violation of Title IX of the Civil Rights Act of 1964 and for Breach of Contract." Plaintiff incorporates his original "Verified Complaint for Violation of Title IX of the Civil Rights Act of 1964" and "First Amended Complaint for Violation of Title IX of the Civil Rights Act of 1964 and for Breach of Contract" as if copied herein verbatim and, by way of amendment for his causes of action against Rhodes College (hereinafter "Rhodes" or "Defendant") respectfully states as follows:

1.      Plaintiff is an adult resident citizen of Fort Bend County, Texas who is twenty-two (22) years of age.

2.      Plaintiff has been granted leave to proceed under a pseudonym due to fear of personal embarrassment, humiliation, and psychological trauma. Specifically, Plaintiff has been falsely accused of acts that, if true, would constitute sexual assault. No criminal charges have been brought against Plaintiff. The harm to Plaintiff would be compounded by the publication of his identity.

3.      Rhodes is a Tennessee Public Benefit Corporation with its principal office at 2000 North Parkway, Memphis, Tennessee 38112.

4.      This Court has subject matter jurisdiction over the necessary particulars of this case under federal question jurisdiction, 28 U.S.C. § 1331, as it arises from Title IX of the Civil Rights Act of 1964, 20 U.S.C. §§ 1681–1688.

5.      Venue is proper in the Federal Court for the Western District of Tennessee at Memphis, as all or a substantial part of the actions giving rise to this suit occurred in Shelby County, Tennessee.

## I. Factual Allegations

6.      Plaintiff re-alleges and incorporates herein, as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

**A.    Rhodes' Duties under Title IX, its Contract, and Tennessee Common Law**

7.      The University is a recipient of federal Department of Education funding and is therefore subject to Title IX.

8.      Title IX and 34 C.F.R. § 668.46(k)(2)(i) placed a duty on Rhodes to establish and follow procedures for resolving allegations of sexual assault from investigation to final result that are prompt, fair, and impartial.

9.      Title IX placed a duty on Rhodes to prevent discrimination on its campus and in its programs and activities, including in its own Title IX/Sexual Misconduct discipline processes. Rhodes' duties under Title IX included a duty not to reach erroneous outcomes in sexual misconduct hearings, not to selectively enforce its Title IX policies, not to retaliate against its students for engaging in protected activity, including the bringing of lawsuits pursuant to Title IX itself.

**B.      The February 14, 2019 SAE Party**

10.     Plaintiff is ███████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████

11.     On or about February 14, 2019, Plaintiff and his friend, ████, attended a formal event at the Sigma Alpha Epsilon ("SAE") fraternity on Rhodes' campus. Plaintiff was a member of SAE. Also in attendance were ████ and ████, female students at Rhodes.

12.     ████ was Plaintiff's date for the event.

13.     During the course of the evening ████ consumed a large quantity of alcohol, smoked marijuana, and used cocaine. In the later part of the evening, ████ became violently ill. Plaintiff, ████, ████., and four other members of the SAE fraternity undertook to ensure that Plaintiff was not in danger. Plaintiff provided ████ a container in which to vomit, ensured that she was lying on her stomach on a chair so that she did not asphyxiate, attempted to persuade her to drink water, and contacted ████ friend, ████ to come and pick her up. When she proved unable to get to her friends' vehicle on her own, ████ asked Plaintiff to carry her. Once she reached the bottom of the ladder[1], ████ assisted her to the vehicle. During the entire relevant

---

1 The group in question was in an attic accessible by ladder.

period, ▨ was incapacitated, in-and-out of consciousness, refusing to drink water, and speaking incoherently.

14.    When ▨. arrived, she found ▨ with Plaintiff, exactly where Plaintiff told ▨ that he and ▨ were. ▨ was lying across three chairs with her head over a bucket. ▨ reports that she was fully clothed.

15.    ▨ was not alone with anyone at any point in time with the brief exception that she was alone with Plaintiff for approximately five minutes after Plaintiff contacted ▨ friends. ▨ spent the majority of the evening surrounded by as many as nine (9) people.

16.    All of the various individuals, both male and female, who observed ▨ at the event later gave statements or testified that ▨ had been intoxicated to the point of incapacity, that several individuals attempted to provide her assistance and care, that, with the brief exception outlined above, she was never left alone, that she was usually in a large group and in mixed company, and that no one touched her inappropriately at any point.

17.    An independent witness, ▨ whom ▨ describes as her friend, gave a statement that "he saw ▨ all night long, and she seemed fine," and that "nothing really out of the ordinary happened at the party."

18.    ▨ reported that Plaintiff was helping ▨ get out of the SAE house.

19.    By ▨ own admission she only remembers "bits and pieces" of the evening, was "unable to comprehend" what was happening around her, but believes that someone had anal sex with her. She has stated that she has no recollection as to who did this to her.

20.    When ▨ arrived, ▨ stated "They raped me." ▨ was incoherent and incapacitated.

21.    ▨ was crying and stating that she did not believe that ▨ believed her.

22.   ████ stated that she wanted to go to the hospital. Upon arrival at the hospital, ████

changed her mind and requested that they go home.

23.   ████ advised ████ roommate ████ that ████ was raped.

**C.   ████ Roommates Interrogate Her While Incapacitated**

████████. and ████ proceeded to interrogate ████ in her intoxicated state. ████

remembers being questioned but not the questions. ████ and ████ asked ████

25.   The Title IX investigative report states, in pertinent part:

> Witness ████ stated ████ was very non-responsive but Witness wasn't worried about alcohol poisoning. Witness stated ████ was very subdued and lacked energy. Witness stated ████ eyes were closed but **she could move one arm instead of speaking.** Witness stated that she and [another female student] asked ████ what happened and started using yes or no questions. Witness stated they started listed (sic) questions to figure out who raped her, i.e. was it a freshman, sophomore, junior, etc. Witness stated ████ gave a thumbs up to it being a senior. Witness stated she asked was it ██, and ██ gave a thumbs up. Witness stated she asked was it ██, and ██ again gave a thumbs up. Witness stated that when asked about anyone else, ████ motioned that she was unsure. (emphasis added)

26.   ████ also reported that "Witness stated that they asked ████ if the guys had sex with her and ████ gave a thumbs down."

27.   ████ also wrote down the first four letters of ████ first name on a piece of paper provided by another female student. Witness stated that she asked whether she was referring to ████ ██. again "gave a thumbs up" in reference to ████.

28.   ████ then stated ████ is not ok," and "she is not a good person," and then stated "she made it all happen."

29.   ████ another of ████ roommates, gave a statement that the night of the alleged incident that she and ████ interrogated ████ by asking her leading questions naming specific individuals including ████ and ████ to which ████. "gave a thumbs up."



30.     ▆▆▆ gave a statement in which she said ▆▆▆ reported ▆▆▆ is bad, and ▆▆▆ said ▆▆▆ is the one that told them to do it and that it wouldn't have happened without her. Witness stated ▆▆ was actually able to articulate this."

**D.     ▆▆▆ Voices Doubts and Seeks a Rape Kit**

31.     The next morning, ▆▆▆ reported that ▆▆▆ said "she thinks she was raped but she doesn't know if she's misremembering."

32.     ▆▆▆ then told ▆▆▆. that "she was adamant that she was raped the night before."

33.     ▆▆▆. stated that "▆▆ [was] still trying to remember what happened and is unclear."

34.     ▆▆▆ stated that "it felt like something must have happened."

35.     ▆▆▆ took ▆▆. to the hospital. ▆▆▆ leaving ▆▆▆ in the car, went into Methodist hospital and requested a rape kit for ▆▆▆

36.     ▆▆▆ then went into the hospital with ▆▆▆. ▆▆▆. requested that ▆▆▆ leave the room.

37.     ▆▆▆. was administered an examination and rape kit.

38.     Hospital personnel, following protocol, contacted Memphis Police Department, who took ▆▆ to the Rape Crisis Center. A group of ▆▆▆' friends accompanied her.

39.     ▆▆▆ and her friends were interviewed by a detective and gave statements to the sex crimes unit.

40.     Another of ▆▆▆' roommates, ▆▆▆ also gave a statement that on the morning of February 15 ▆▆. said, when prompted, that she remembered *saying* that she was raped and mentioning Plaintiff, ▆▆. and ▆▆. the night before, but that she also stated oh my God, I think I was drugged, I don't know what happened last night."

41.  ███ advised the police that ███ had accused ███ the night before and provided

the note on which ███. had written ███'s name.

42.  That same day, ███. told her parents that she had been raped.

**E.  MPD Questions Students and Rhodes Faces Public Pressure to Punish Male Students**

43.  At approximately 5:30 p.m. on February 15, 2019, Rhodes published a notice

that a sexual assault had been reported on campus. This was the first instance in which Rhodes

began to discriminate against male students. Campus Safety Director Ike Sloas sent the following

statement in his notification:

> "Today, a female Rhodes student reported she was sexually assaulted. The assault
> occurred on campus early this morning (2/15/19). The male Rhodes student suspects
> are known to the female student. The Memphis Police Department is actively
> investigating the report."

At the time that this report was sent, on information and belief, the MPD had not identified any

suspects to Rhodes or any other party. They were, however, investigating several persons of

interest *including* a female student, ███. The MPD tagged into evidence the piece of paper on

which ███. wrote a portion of ███ name referenced in Paragraph 27 above. In essence, despite

the existence of male and female "suspects" Rhodes began to bias its students, faculty, and

administration against male students even at this early stage. Further, Rhodes did this <u>for no

legitimate reason</u>. The type of notice issued by Ike Sloas is called a Clery Timely Warning

Notice ("CTWN"). A CTWN is mandated by the Clery Act, 20 U.S.C. § 1092 et seq., which

requires funding recipients to provide a timely warning to individuals on campus sufficient to

enable members of the community to protect themselves. While, no doubt, it was reasonable to

issue a CTWN upon notification of a police investigation into a possible rape, the inclusion of

the gender of the "suspects" was both unnecessary and inaccurate information that helped engender bias against male students.

44.     The MPD came to Rhodes' campus to question students. Various news organizations obtained footage of the police on Rhodes' campus and reported the allegations of sexual assault at the SAE house.

45.     Both Plaintiff and ▇ cooperated in the MPD investigation, promptly providing DNA samples to compare to any sample taken from the rape kit or from ▇' clothing, which MPD preserved in evidence.

46.     Neither Plaintiff nor ▇. has been charged with any crime.

47.     Shortly thereafter, ▇ retained Robert Hale of Glankler Brown to represent her. On information and belief ▇ and Attorney Hale are attempting to assert a civil claim against the SAE fraternity.

48.     The week immediately following the alleged event, an organization called "Culture of Consent" approached all of the fraternities on campus and requested that they cancel all functions for the upcoming weekend while Culture of Consent staged a protest.

49.     This protest was clearly directed at fraternal organizations and the Rhodes administration and designed to pressure Rhodes into finding male students responsible for violations of the sexual misconduct policy.

50.     A number of protesters specifically accused Rhodes of covering up sexual assaults by male students.

51.     On February 20, 2019, Culture of Consent posted the following to its Facebook page:

HEY IFC!

For decades you have branded yourselves as gentlemen, model members of society that every young man on campus should aspire to be. You have failed miserably to live up to those lofty ideals. You espouse sentiments of brotherhood, of service; however, time and time again you have shown that you put your own trivial interests above all else, including human decency and public safety.

THE SUBJECT OF IKE SLOAS' EMAILS THIS SEMESTER COULD HAVE BEEN PREVENTED. Your refusal to take responsibility for the continued sexual violence perpetrated by your members is unacceptable. We know there are men among you who stand against the history of violence perpetuated by your organizations, and it's time for you to stand up for your values, lest you be counted among the apathetic masses who fail to take action.

DID YOU KNOW....There are rules within individual fraternities set in place to prevent sexual assault and keep members of the Rhodes community safe. The problem is they are not being followed. The culpability falls on those who have power and refuse to implement these measures to protect the student body.

OUR DEMANDS

1. HOLD YOURSELVES ACCOUNTABLE: Hold individual members who have perpetrated sexual misconduct accountable for their actions through immediate suspension of membership and eventual expulsion. Don't wait for Title IX and survivors to hold them accountable. Be the ones to take initiative and ownership over the actions and behavior of your members.

2. MANDATE TRAINING: Each of you have programming initiatives for both prospective members and active members. This must include training on bystander intervention and sexual assault prevention and must be mandatory for ALL members.

3. USE YOUR VOICE: Call out and condemn acts of sexual violence in our community, even if your leadership won't. Show your support for survivors, and stop waiting for others to speak for you. #AskForBetter

TO THOSE OF YOU NOT IN A FRATERNITY....if you continue to support those organizations who refuse to reform and refuse to make our campus a safer place, you are complicit. Do not attend fraternity functions until they make it clear that they will meet these demands.

This is a chance for Rhodes to grow and improve as a community. It is a chance for Rhodes' Greek life to be an example instead of the problem. It is a chance for Rhodes to be a place where we all feel safe. Do better, Rhodes.

52.    The members of IFC and Rhodes' fraternities are, by definition, exclusively male.

53.    Culture of Consent focused their protest against male students only, not against perpetrators of sexual violence generally.

F.    **The Discriminatory and Inconclusive Title IX Investigation**

54.    ▓ did not, at any point, initiate a Title IX complaint to the school.

55.    Following the notification by the MPD that they were pursuing an investigation into the events of February 14-15, Rhodes initiated its own Title IX investigation for violations of its sexual misconduct policy.

56.    When Rhodes' investigator, Emma Davis, an attorney with Baker Donelson, interviewed ▓ she stated that she recalled ▓ being present while the rape was happening.

57.    Rhodes' investigator interviewed fourteen witnesses (both male and female) excluding the accused and ▓ <u>Not one witness corroborated that ▓ had been raped or that she had even been left in a position to be raped.</u> The only evidence that ▓ had been raped were ▓' statements made to ▓ and ▓ while incapacitated and intoxicated.

58.    During the course of Rhodes' investigation, the investigator interviewed ▓. Despite ▓. having made more clear allegations about ▓ than those against Plaintiff or ▓ the Rhodes investigator did not even ask ▓. about those allegations.

59.    Rhodes' investigator interviewed a male student, ▓ who informed the investigator that he was present in the room with ▓ for virtually the entire time that she was present in the upstairs room. ▓ stated that he would have seen anything that happened to her and stated that <u>no sexual assault or inappropriate contact with ▓ took place. He described ▓ as intoxicated, incoherent, and vomiting.</u>

**G.**     <u>**Rhodes Faces Renewed Pressure to Punish Male Students**</u>

60.     On April 4, 2019, Culture of Consent posted the following to their blog:

> Schools grant their star football players a special leniency regarding sexual assault, and it keeps me up at night.
>
> So why are these men not held accountable? Why are star football players, men who not only little boys, but also little girls, look up to as role models, not punished for committing something so serious as sexual assault?
>
> This is male football player privilege.
>
> Every day I watch football players walk around a Division Three school like they own the place. Before home football games, the men at Rhodes College dress up in suits, parade across campus, walk to their promised land, to our promised land: the football field. We treat football players like kings.

61.     Accordingly, Culture of Consent again directed its pressure on Rhodes' administration exclusively at male students, not against perpetrators of sexual assault.

62.     Both ███ and Plaintiff were football players, and this post was made just three days after the Title IX investigation was completed and just thirteen days prior to the disciplinary hearing for Plaintiff and ███.

63.     On information and belief, Rhodes rarely, if ever, independently initiates Title IX complaints against female students but does independently initiate complaints against male students.

**H.**     <u>**Rhodes Holds a Procedurally Defective Hearing Tainted by Gender Discrimination**</u>

64.     On April 5th, 2019, Rhodes charged Plaintiff and ███ with violations of its sexual misconduct policy.

65.     On or about April 17, 2019, Rhodes held a hearing on whether Plaintiff and ███ had violated the sexual misconduct policy.

11

66.     At the hearing, Plaintiff and ▮▮▮ appeared and denied any wrongdoing.

67.     The alleged victim, ▮▮▮ did not attend or participate in the hearing at all. She was not subject to any questioning by the decision panel or subject to cross-examination of any kind whatsoever.

68.     Despite ▮▮▮ decision not to participate in the Title IX disciplinary proceeding, she did send her attorney. He was not permitted to participate, but he was permitted to sit in the hearing. Throughout the hearing, Attorney Hale held a file that said "▮▮▮ v. SAE" on the outside, visible to the entire panel and everyone else present at the hearing.

69.     Despite Rhodes' policy that they have discretion to admit anyone they deem appropriate to the Title IX hearing, the attendance of an attorney for a non-participant who did not initiate the Title IX proceeding violates the confidentiality requirements of FERPA and Title IX.

70.     Not one single witness during the proceeding testified in a manner that supported ▮▮▮ contention through any form of direct evidence.

71.     In fact, every witness who was present at the SAE party testified that they were regularly in the presence of ▮▮▮ and that nothing happened.

72.     ▮▮▮ the female student that ▮▮▮ accused repeatedly of being the instigator of and a participant in her alleged rape testified at the hearing. The Title IX panel did not ask ▮▮▮. a single question about her alleged involvement in the alleged incident.

73.     The only testimony that related to Plaintiff and ▮▮▮ conduct towards ▮▮▮ was that they attempted to help ▮▮▮ and that they contacted her friends to come and pick her up.

74.     No testimony placed ▮▮▮ and Plaintiff alone with ▮▮▮ together at any time. No testimony placed ▮▮▮ alone with ▮▮., and the only testimony placing ▮▮. alone with ▮▮▮

indicated that he was alone with her for only approximately five minutes after contacting ███ to come and pick her up.

75.     Without having provided Plaintiff or ███ any warning, the Title IX coordinator, Tiffany Cox, introduced additional "evidence" into the record at this proceeding. Faced with no actual evidence on which to base a finding of responsibility, Ms. Cox introduced one page of a medical examination indicating that ███ had superficial injuries to her rectum. The panel was asked to take this as dispositive of the allegation that ███ had actually been raped.

76.     The panel questioned Plaintiff and ███. about the content of this medical record, asking them to speculate on the cause of the injuries. Obviously, they could not do so and did not have an opportunity to consult with a medical professional or present testimony as to that issue.

77.     The superficial injuries described in the report are consistent with many possible causes. For example, and *inter alia*, the injuries could be caused by hard stool or other gastro-intestinal disorders and consensual anal penetration. Because ███ was not present, she could not be asked about these possible causes.

78.     Crucially, the hearing panel permitted the female "witnesses" who testified about the hearsay statements supposedly made by ███ during her intoxication to testify.

79.     Despite his obvious necessity to a fair adjudication, Rhodes did not even call ███ the male student referenced in Paragraph 59 above, as a witness. Plaintiff called ███ in addition to the witnesses selected by the hearing panel.

80.     The hearing panel heard direct testimony from ███ who testified that he had direct knowledge of the events of that evening as they related to ███ that he was present around her virtually the entire evening, and that no sexual misconduct took place.

81. Rhodes decision to privilege the testimony of female students to secondhand hearsay over the testimony of a male student to his direct knowledge further demonstrates Rhodes' discrimination against Plaintiff on the basis of gender.

I. **Rhodes Selective Enforcement of its Title IX Policy**

82. Rhodes selectively enforced its Title IX policy by charging only Plaintiff and ████ the male accused, with a violation of its sexual misconduct policy.

83. ████ is a student at Rhodes College and is therefore subject to the Rhode College Title IX policy. The allegations made against ████ which were verbal and written in nature as opposed to hand gestures, were at least as likely to implicate ████ in sexual misconduct as defined under Rhodes Title IX policy as the "allegations" made against Plaintiff and ████.

84. Rhodes Title IX policy, for example, prohibits the following conduct:

    a. *Sexual Misconduct:* Is a broad term that encompasses sexually-motivated misconduct as described in this policy, including conduct of an unwelcome and/or criminal nature, whether such conduct occurs between strangers, acquaintances, or intimate partners. For the purposes of this policy, the following terms are collectively referred to as "Sexual Misconduct" and will be defined in detail below: Dating Violence, Domestic Violence, Nonconsensual Sexual Contact, Nonconsensual Sexual Penetration, Sexual Assault, Sexual Exploitation, Sexual Harassment, Sexual Violence, and Stalking;

    b. Engaging in unlawful conduct based on one's gender, sexual orientation, gender identity or expression, including, but not limited to, acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex/gender or sex/gender-stereotyping, even if the acts do not involve conduct of a sexual nature;

    c. Making unwelcome sexual advances, propositions or other sexual or gender-based comments, such as sexual or gender-oriented gestures, sounds, remarks, jokes or comments about an individual's gender, sex, sexuality or sexual experiences;

    d. Requesting sexual favors, or engaging in other verbal or physical conduct of a sexual nature;

e. Verbal abuse of a sexual nature, graphic verbal commentaries about an individual's body, sexually degrading words used to describe an individual, or suggestive or obscene letters, notes, drawings, pictures or invitations, or through digital media;

f. Exceeding the boundaries of consent (such as, permitting others to hide in a closet and observe consensual sexual activity, videotaping of a person using a bathroom or engaging in other private activities);

g. Engaging in voyeurism, exposing one's breasts, buttocks, or genitals in a non-consensual circumstance or inducing another to expose their breasts, buttocks, or genitals without affirmative consent;

85. In addition to the fact that ▮▮ would necessarily have violated the above seven (7) provisions of Rhodes' Title IX policy if ▮▮ allegations against ▮▮ were true▮ ▮▮ has never stated clearly *who* she alleges raped her. She specifically stated that she could not recall who actually raped her, but she did specifically recall ▮▮ presence. ▮▮ also never stated whether she was penetrated by an individual with a body part or an object. If the presence of Plaintiff and ▮▮. is sufficient evidence to determine that they have violated the Title IX policy, then ▮▮ presence should implicate her equally.

86. Rhodes ultimately charged Plaintiff and ▮▮ with Non-Consensual Sexual Penetration. Rhodes' Title IX policy defines "sexual penetration" "as sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of any other person's body." Rhodes has never articulated a basis for its assertion that Plaintiff and ▮▮. violated this policy, but not ▮▮ whom Plaintiff accused of involvement by name. The most reasonable explanation for this is that Rhodes did not consider the possibility that a

female student penetrated another female student within the meaning of this definition, but instead assumed that only a male student would or could do so.

87.    Despite the much more substantial allegations against ▇ a female student who ▇ more clearly accused of sexual misconduct, Rhodes elected to charge only male students.

88.    No reasonable person could find, based on the absolute dearth of direct evidence against Plaintiff and ▇., that they sexually assaulted ▇. In fact, absent the recovery of semen or other DNA evidence from ▇' rape kit, no reasonable person could, by a preponderance of the evidence, determine that she had, in fact, been raped. Her position on whether the rape actually occurred has evolved substantially since the day following the rape. She has gone from possibly "misremembering" the events to stating that she was sexually assaulted, but she has been totally unable to identify the alleged perpetrator(s). The sole evidence linking Plaintiff or ▇ to the alleged rape is a "thumbs up" when asked a leading question by her roommate while intoxicated to the point that she could not speak, a statement that she herself contradicted when she gave a "thumbs down" when asked if "the guys had sex" with her.

89.    The only individual that she verbally accused of involvement in the alleged sexual assault was ▇ a female student. Rhodes decision not to so much as inquire into ▇ alleged involvement had the obvious effect of rendering the Title IX process fundamentally flawed and is facially discriminatory.

**J.    Rhodes Expels Plaintiff and ▇**

90.    Despite this total dearth of evidence against Plaintiff and ▇ the hearing panel found that both of them were responsible for sexual misconduct by a preponderance of the evidence, and both were expelled from Rhodes.

91.     As a result of Rhodes' expulsion, which was the direct result of gender bias, Plaintiff will not graduate and will lose his employment offer, which is slated to begin upon his graduation.

92.     Plaintiff alleges that Rhodes, under pressure from the media, Culture of Consent, and ▋▋ tort attorney, intentionally singled out two male students against whom to prosecute a spurious allegation of sexual assault based on virtually no evidence while simultaneously electing not to pursue a more fully-articulated (though still questionable) claim of violating the sexual misconduct policy against a female student.

**K.**          **Rhodes Retaliates Against Plaintiff for Bringing this Suit**

93.     Following the initial Title IX investigation that underpinned this suit, a second student made a Title IX complaint predicated on an evening of consensual sexual activity with Plaintiff. Following learning of the investigation by Rhodes, and the spurious allegations against Plaintiff, this student decided that sexual activity that she did not previously consider to have been misconduct did, in fact, constitute sexual misconduct. Plaintiff, of course, denies that any non-consensual sexual activity occurred.

94.     Rhodes investigated this claim contemporaneously with its investigation of the claim originally underlying this lawsuit. Rhodes completed its investigation, and the investigator, Emma Davis (the same investigator), produced a report a few days after the first report and significantly prior to the Title IX hearing or Plaintiff's expulsion from Rhodes.

95.     Rhodes then did nothing with this complaint. In a hearing before this Court on June 6, 2019, Defendant asserted that the investigation was "placed on hold, since the first case was proceeding towards an on-campus hearing."

96.     Rhodes did not notify either student of the decision to place this matter "on hold," nor did Rhodes ever justify this beyond saying that "the first case was proceeding towards an on-campus hearing."[2]

97.     34 C.F.R. 668.46(k)(2)(i) requires funding recipients to promulgate a policy setting a timeframe for the resolution of sexual misconduct complaints and to adhere to that timeframe except or good cause and written notification of any delay to both parties.

98.     Rhodes College's Sexual Misconduct Policy states, in pertinent part:

> Most investigations into **incidents of alleged Sex/Gender Discrimination and Sexual Misconduct will be completed within sixty (60) calendar days, excluding any appeal(s)**. The amount of time needed to investigate a Report or Claim will depend in part on the nature of the allegation(s) and the evidence to be investigated (e.g., the number and/or availability of witnesses involved), as well as the College's academic calendar. . .
>
> **Rhodes will make reasonable efforts to balance and protect the rights of the parties during any investigation commenced under the Policy.** Rhodes will respect the privacy of the parties and any witnesses in a manner consistent with the College's obligations to investigate the alleged incident, take appropriate interim and/or corrective action, and comply with any discovery or disclosure obligations required by law. . .
>
> **Rhodes will keep the parties reasonably informed of the status of the investigation. If it is determined that more time is needed for the investigation, Rhodes will communicate the additional estimated amount of time needed to complete the investigation.** (emphasis added)

99.     The second investigation was completed and a report produced on April 12, 2019. During this time, Plaintiff was still in school, still a student in good standing, still attending classes, and still subject to the school's policies and procedures. Defendant could have completed its second Title IX matter contemporaneously with the first, and it had every opportunity to do so.

---

2 Plaintiff avers that this renders obvious the fact that Rhodes had already determined the outcome of the hearing before it took place. Otherwise, why would Rhodes not simply proceed with both matters?

100.     Still, the school did nothing. It did not charge Plaintiff. It did not set or hold a hearing of any kind, and it did not notify Plaintiff of any delay.

101.     In reliance on this policy and the federal regulation, Plaintiff awaited some action on this second Title IX matter for sixty (60) days. Plaintiff waited for the sixty (60) days to pass before bringing this suit to challenge his expulsion via this lawsuit.

102.     On June 6, 2019, this Court heard arguments regarding the Temporary Restraining Order in this case. Plaintiff asserted that he was entitled to his degree. That same day, in its defense, Defendant falsely asserted that he had not completed his academic requirements. (In fact, Plaintiff had completed his academic requirements. It was Defendant who stopped his professors from entering his grades into the school's computer grading system.) Defendant also asserted that the second Title IX matter had to proceed and be resolved. In support of this assertion, Defendant filed an affidavit with the Court stating:

> In addition to the academic criteria explained above, students are not
> entitled to graduate from Rhodes College while disciplinary processes are
> pending against them. Setting aside any questions about the Title IX
> matter currently before the Court, there is a second Title IX claim pending
> against plaintiff, which was placed on hold while the first Title IX matter
> was adjudicated. The second Title IX claim would need to be resolved
> before Plaintiff would be eligible to graduate. (ECF 24-1 ¶ 11.)

103.     This Court subsequently enjoined Plaintiff's expulsion from Rhodes, and Rhodes then claimed that Plaintiff was a student subject to discipline under the school's policies. Rhodes, however, did not restore to Plaintiff any of his other privileges as a student. It did not reinstate Plaintiff's student email. It did not put Plaintiff's grades on his transcripts, It did not calculate Plaintiff's GPA. What it did do was declare Plaintiff to be subject to an "interim suspension,"

thereby claiming that it had no duty to do anything other than hold yet another Title IX proceeding.

104.     Defendant then re-initiated the second Title IX matter, charging Plaintiff with sexual misconduct again.

105.     Worse, Defendant clearly anticipated that Plaintiff was planning to take legal action, and, therefore, it plainly intended to hold back this second Title IX matter to use as a backstop for its flawed decision. On Monday, July 1, 2019, Defense counsel sent Plaintiff's counsel an email containing the following statement "It was my understanding your client's email was reactivated, but I am not 100%. Please check and I'll do the same. **A copy of the email account was preserved for purposes of the litigation.**" In other words, Defendant admittedly anticipated and planned for litigation against Plaintiff, and instead of resolving the second Title IX matter, they held it in reserve so that, should Plaintiff prove successful, they would have another basis on which to justify their wrongful expulsion of Plaintiff.

106.     As a result of Defendant's decision to place this second matter "on hold" rather than timely resolving it, Defendant has created a Sword of Damocles suspended above Plaintiff specifically designed to deter him from challenging the various acts of discrimination alleged herein.

## II. Causes of Action

### Count 1 - Denial of Equal Access to Education on the Basis of Gender in Violation of 20 U.S.C. § 1681 (Title IX) – Erroneous Outcome

107.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

108.     The acts and failures to act, perpetrated against Plaintiff amounted to discrimination on the basis of gender.

109.     Specifically, Plaintiff avers that the facts set forth above, including but not limited to the failure to require the participation of ███ in the Title IX hearing or to permit any form of cross-examination of ███. and the introduction of last-minute evidence not previously presented to Plaintiff, cast articulable doubt on the outcome of the proceedings.

110.     Plaintiff avers that the erroneous outcome of the proceedings was motivated by gender bias in that the failure to charge ███ with a violation of the sexual misconduct policy demonstrates a specific desire to initiate disciplinary proceedings for sexual misconduct against male students but not against female students.

111.     Plaintiff avers that the erroneous outcome of the proceedings was motivated by gender bias in that the hearing panel's decision to seek the testimony of female students regarding hearsay information while not eliciting nor crediting the testimony of male students with relevant, direct, personal knowledge demonstrates a specific desire to credit the testimony of female students over male students.

112.     In addition, Plaintiff avers that the erroneous outcome of the proceedings was motivated by gender bias in that the failure to charge ███ a decision that can only be reasonably linked to Plaintiff and ███ genders, both substantially and materially impacted the outcome of the proceedings.

113.     Additionally, and in the alternative, Rhodes was under outside pressure to hold male students accountable for sexual assault. Specifically, the Culture of Consent protest on Rhodes' campus as well as social media posts, directed specifically at fraternal organizations and the administration, coupled with the attendance at the Title IX hearing of Attorney Robert Hale, who is, on information and belief, developing a lawsuit against the SAE fraternity, demonstrates that Rhodes was under substantial outside pressure to reach an outcome that was adverse to

fraternity members, who are by definition, universally male. Rhodes was also under pressure from Culture of Consent to hold male football players responsible for sexual misconduct violations.

114.    Additionally, and in the alternative, on information and belief, Rhodes has a pattern or practice of independently bringing sexual misconduct cases against male students substantially more often than against female students. On information and belief, while Rhodes frequently independently initiates Title IX/sexual misconduct investigations into male students based on third-party complaints or information that comes to its attention without a complaint by the alleged victim, it rarely does so to female students. This pattern or practice constitutes gender discrimination that led to the erroneous outcome of the student discipline proceeding against Plaintiff.

115.    Plaintiff has and will continue to incur attorney fees and costs of litigation.

### Count 2 - Denial of Equal Access to Education on the Basis of Gender in Violation of 20 U.S.C. § 1681 (Title IX) – Selective Enforcement

116.    Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

117.    The acts and failures to act, perpetrated against Plaintiff amounted to discrimination on the basis of gender.

118.    Plaintiff avers that gender bias motivated Rhodes to charge Plaintiff and ███ but not ███ with a violation of the sexual misconduct policy, amounting to selective enforcement of Title IX.

119.    Additionally, and in the alternative, Rhodes was under outside pressure to hold male students accountable for sexual assault. Specifically, the Culture of Consent protest on Rhodes' campus, directed specifically at fraternal organizations and the administration, coupled

with the attendance at the Title IX hearing of Attorney Robert Hale, who is, on information and belief, developing a lawsuit against the SAE fraternity, demonstrates that Rhodes was under substantial outside pressure to reach an outcome that was adverse to fraternity members, who are by definition, universally male. Rhodes capitulation to this pressure amounted to selective enforcement of Title IX.

120.     Additionally, and in the alternative, on information and belief, Rhodes has a pattern or practice of independently bringing sexual misconduct cases against male students substantially more often than against female students. On information and belief, while Rhodes frequently independently initiates Title IX/sexual misconduct investigations into male students based on third-party complaints or information that comes to its attention without a complaint by the alleged victim, it rarely does so to female students. This pattern or practice amounts to selective enforcement of Title IX.

121.     Plaintiff has and will continue to incur attorney fees and costs of litigation.

### Count 3 - Denial of Equal Access to Education on the Basis of Gender in Violation of 20 U.S.C. § 1681 (Title IX) – Retaliation

122.     Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges.

123.     The acts and failures to act, perpetrated against Plaintiff amounted to discrimination on the basis of gender.

124.     Plaintiff engaged in protected activity under Title IX when he filed the instant lawsuit.

125.     Defendant was aware of Plaintiff's protected activity.

126. Plaintiff avers that Defendant's decision to place "on hold" the second Title IX process rather than timely resolving it and the deterrent effect created thereby constituted adverse educational action.

127. Plaintiff avers that Defendant's decision to reinitiate those proceedings when this Court enjoined Plaintiff's expulsion constitutes an adverse educational action.

128. Plaintiff avers that Defendant's refusal to place Plaintiff's grades on his transcripts constitutes an adverse educational action.

129. Plaintiff avers that any and all other acts that have negatively impacted Plaintiff's ability to graduate and/or seek other educational opportunities or employment also constitute adverse educational actions.

130. Plaintiff avers that Defendant's actions are materially adverse in that they might have dissuaded a reasonable student from making or supporting a charge of discrimination.

131. Defendant's conduct as described above lacks a legitimate factual justification, was not actually motivated by any legitimate factual justification, or was insufficient to warrant the adverse educational action against Plaintiff.

132. Plaintiff has and will continue to incur attorney fees and costs of litigation.

### Count 4 - Breach of Contract

133. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

134. Rhodes' Student Handbook and Title IX procedures form a contract between Rhodes and Plaintiff, setting forth reciprocal responsibilities of both Rhodes and the students to each other.

135.   Rhodes is the drafter of the terms of the contract, and the contract, where ambiguous, must therefore be construed against Rhodes.

136.   All Tennessee contracts carry an implied covenant of good faith and fair dealing.

137.   Rhodes Title IX Handbook states, in pertinent part:

**B. The Formal Resolution Hearing and Determinations of Responsibility**

1. At the Formal Resolution Hearing, the Investigator may give a statement containing a summary of their factual findings, and each party will have the option to provide an introduction and an opening statement, summarizing their position.

2. Each party will be permitted to call their own witnesses. Witnesses will be asked to affirm adherence to the Honor Code. Prospective witnesses, other than the Claimant and the Respondent, may be excluded from the hearing during the statements of the Investigator and other witnesses. The Sexual Misconduct Hearing Board will not consider information from character witnesses or character testimony.

3. The Board, the Claimant and the Respondent will have an opportunity to question witnesses who appear at the hearing. In other words, any person who offers testimony at the hearing must remain available to answer questions from the Board and both parties. Questions by the Claimant and the Respondent should be directed to the Board Chair, who will facilitate the questioning of all witnesses, including the Investigator. Typically, the Board will ask its own questions first, then the questions of the party whose witness it is, then the questions of the other party. The Board Chair will be responsible for ensuring the questioning is fair and complies with the terms of the Policy, but will not otherwise substantively limit the scope of the parties' questions unless they seek to elicit solely character evidence, irrelevant information, unduly cumulative evidence, or have the effect of impermissibly badgering or harassing the witness. Questions about the parties' sexual history with anyone other than each other are expressly prohibited during the hearing phase, but if the Respondent is found in violation of the Policy, Respondent's past sexual misconduct may be subject to inquiry in connection with determining potential sanctions.

4. The Board may, in its discretion, exclude or grant lesser weight to last-minute information or evidence introduced at the hearing that was not previously presented for investigation by the Investigator.

5. At the conclusion of the hearing, the Investigator may give a closing statement and each party will have an opportunity to provide a closing statement at their option.

6. All parties, the witnesses and the public will be excluded during Board deliberations, which will not be recorded or transcribed.

7. The Title IX Coordinator will be present at the hearing and can assist with procedural matters. However, the Title IX Coordinator will not participate in the deliberations of the Hearing Board in determining responsibility.

**8. In all cases, the Hearing Board must consider evidence presented by the Claimant, the Respondent, the Investigator and/or others and determine by a preponderance of the evidence whether a violation of the Policy occurred, i.e., whether it is more likely than not that a Respondent violated the Policy, and impose sanctions, if any.**

9. The Hearing Board will notify the Title IX Coordinator of the decision.

10. Decisions made in a Formal Resolution Hearing may be appealed as described in the Appeal Section below. (emphasis added)


138. Rhodes College, through its agents and employees, breached its contract with Plaintiff in that the Title IX hearing panel plainly disregarded and failed to consider evidence presented by the Claimant, specifically multiple witnesses fully exonerating him who testified in direct contradiction to the allegations against him when no witness, including the alleged victim, was able to corroborate the sexual misconduct charges against him.

139. Rhodes College, through its agents and employees, breached its contract with Plaintiff in that the Title IX hearing panel when it ignored its own standard of proof, preponderance of the evidence, and found Plaintiff to have committed sexual misconduct despite a total lack of evidence against him. No reasonable person acting in good faith could have reached the conclusion that Plaintiff violated the school's sexual misconduct policy.

140. Rhodes further breached its contract with Plaintiff when it failed to resolve the second Title IX complaint within the sixty (60) day timeframe set forth in its policies and failed

to notify Plaintiff that it did not intend to resolve said Title IX process within the sixty (60) day period.

141. As a result of Rhodes's breach of contract, Plaintiff has suffered damages both actual and consequential and will continue to suffer immediate and irreparable harm for which there is no adequate remedy at law.

<u>**Count 5 - Negligence**</u>

142. Plaintiff re-alleges and incorporates herein as if set forth in full, each and every allegation contained in the preceding paragraphs and further alleges as follows.

143. Defendant owed Plaintiff a duty of care to refrain from conduct that poses an unreasonable and foreseeable risk of harm.

144. In Tennessee, Colleges and Universities owe their students a specific duty of care to manage sexual misconduct hearings in a fashion that avoids an unreasonable and foreseeable risk of harm. *Doe v. Univ. of the S.,* 2011 U.S. Dist. LEXIS 35166 (E.D. Tenn. 2011).

145. Defendant breached that duty of care by failing to conduct its sexual misconduct hearing in a reasonable fashion.

146. Defendant further breached that duty of care by failing to conclude the second Title IX process in a reasonably timely fashion.

147. Defendant's breaches of its duty of care caused actual and foreseeable harm to Plaintiff as a result of which Plaintiff has suffered damages.

<u>**III. Damages**</u>

148. As a result of Defendants' conduct, Plaintiff has suffered damages for deprivation of his rights under Title IX, damage to reputation, lost income, medical expenses, physical pain

and suffering, and mental and emotional distress, to be established to the Court not in excess of five million dollars ($5,000,000.00).

**WHEREFORE PREMISES CONSIDERED, Plaintiff prays that:**

1.    This Court issue a Temporary Restraining Order and Preliminary Injunction prohibiting Rhodes from enforcing its expulsion of Plaintiff pending further orders of the Court;

2.    This Court issue a permanent injunction prohibiting Rhodes from enforcing its expulsion of Plaintiff;

3.    This Court issue a permanent mandatory injunction requiring Rhodes to purge Plaintiff's academic record of any reference to a finding of sexual misconduct;

4.    This Court enter a judgment against Defendant in an amount to be established to the Court not in excess of $5,000,000.00;

6.    This Court fashion any other appropriate equitable remedy;

7.    This Court award Plaintiff attorney's fees, suit expenses and costs; and

8.    This Court order any further relief to which Plaintiff may prove he is entitled.

Respectfully submitted,

BLACK MCLAREN JONES RYLAND & GRIFFEE
A Professional Corporation

By:    */s/ Brice M. Timmons*
Brice M. Timmons    #29582
Megan E. Arthur    #25243
Christopher M. Williams    #36256
530 Oak Court Drive, Suite 360
Memphis, Tennessee 38117
(901) 762-0535 – telephone
(901) 762-0539 – facsimile
btimmons@blackmclaw.com
marthur@blackmclaw.com
cwilliams@blackmclaw.com
*Attorneys for Plaintiff*

28

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing pleading was filed electronically. Notice of this filing will be sent by operation of the Court's ECF system this 7th day of July, 2019 to:

Woods Drinkwater
Nelson Mullins Riley
  & Scarborough, LLP
150 Fourth Avenue, North, Ste. 1100
Nashville, Tennessee 37219
Woods.drinkwater@nelsonmullins.com


James A. Haltom
Nelson Mullins Riley
  & Scarborough, LLP
150 Fourth Avenue, North, Ste. 1100
Nashville, Tennessee 37219
James.haltom@nelsonmullins.com

/s/ Brice M. Timmons